IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMIE LICHTENSTEIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 09-1350 |
| | ) |
| UNIVERSITY OF PITTSBURGH MEDICAL | ) |
| CENTER t/d/b/a UPMC; UPMC | ) |
| PRESYBYTERIAN SHADYSIDE d/b/a | ) |
| WESTERN PSYCHIATRIC INSTITUTE | ) |
| AND CLINIC; UPMC BRADDOCK, and | ) |
| DEBORAH LIDEY, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Pending before the Court is a motion seeking summary judgment
on both counts of the Amended Complaint, filed by Defendants
University of Pittsburgh Medical Center, UPMC Presbyterian
Shadyside, UPMC Braddock (collectively, "UPMC") and Deborah Lidey.
(Doc. No. 34, "Motion.") Plaintiff claims that in violation of the
Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., her employment
at UPMC Braddock was terminated when she applied for leave to take
care of her seriously ill mother. For the reasons discussed below,
summary judgment is entered in favor of Defendants.

## I.   INTRODUCTION

### A.   Factual Background[1]

In October 2005, Plaintiff Jamie Lichtenstein was hired as a research associate by the Western Psychiatric Institute and Clinic ("WPIC"), part of the University of Pittsburgh Medical Center complex of health care providers.  Approximately two years later, Ms. Lichtenstein interviewed for a position as a psychiatric technician at the UPMC hospital located in Braddock, Pennsylvania. During the interview, Deborah Lidey, the clinical administrator for the psychiatry, inpatient detoxification and emergency behavioral health programs at UPMC Braddock, became aware that Ms. Lichtenstein was attending school part-time and taking two classes that semester. Ms. Lidey told Plaintiff that although the job for which she was being considered was a full-time position, she was willing to accommodate Ms. Lichtenstein's need for time off to attend classes.  No formal agreement was arrived at, however, and Ms. Lichtenstein inferred from the conversation that she would be given time off for other school-related activities as well.

Ms. Lichtenstein transferred from WPIC to UPMC Braddock on September 10, 2007.  The parties disagree on the issue of whether employees who transfer from one facility or position to another

---

[1]   The facts in this section are undisputed unless otherwise noted, based on the Court's reading of the parties' concise statements of material facts, the appendices, and responses thereto, Doc. Nos. 35-36, 43-44, and 50.

2

within the UPMC system are subject to a six-month orientation period. According to Ms. Lidey, in such circumstances, the employee is on probation during that period; Ms. Lichtenstein contends that she was never told she was on probation and believed her transfer from WPIC was a lateral transfer to which a probationary period did not apply. If an employee were on probation, UPMC Braddock policy did not require a formal series of verbal or written warnings before disciplinary action could be taken.

Plaintiff was assigned to a unit referred to as "4-East" where her supervisor was Ms. Lidey. Because of legal mandates applicable to behavioral health units, a minimum number of medical staff were required to be present during all working shifts. The work schedule for 4-East was prepared by Amy Kies Harris, Ms. Lidey's administrative assistant. Ms. Harris contacted employees prior to completing each schedule so they could provide her with any requests to adjust their working hours for the upcoming period. If an employee missed the deadline for requesting time off, there was no guarantee the request could be granted. And, if an employee needed to take time off or change her working hours after the schedule had been prepared, she was required to advise Ms. Lidey, Ms. Harris, or the clinical coordinator Cynthia Krautz.

Shortly after she transferred to UPMC Braddock, Ms. Lichtenstein participated in a two-day orientation session during

3

which she was instructed in the hospital's "call off procedure." If an employee needed to call off, she was required to call one of two different telephone numbers. Employees who worked on 4-East were also instructed to leave a message with Ms. Harris or, alternatively, contact a nursing supervisor if the call was made during hours when Ms. Harris was not in the office. In addition, if the employee needed to call off on short notice, she was responsible for finding a substitute to cover the time she had been scheduled to work in order to avoid a situation in which other employees would be forced to work more than their original schedules in order to maintain the required number of employees on the unit. Ms. Harris maintained a "staff log" on which she recorded the dates and reasons the employee had called off and other work-related information such as dates on which the employee was late to work or left early. This log supplemented the hospital's computerized time system and Ms. Harris acknowledged it was not always completely accurate or up-to-date.

During her orientation, Ms. Lichtenstein also was advised about the hospital's absenteeism and tardiness policy. According to the policy, an employee was considered tardy if she reported for her shift more than five minutes after the scheduled start time.[2] A full-time

---

[2] Plaintiff contends that an employee was considered tardy if she arrived more than seven minutes after her scheduled start time. She bases this conclusion on the fact that this had been the policy at WPIC and "no one told her to the contrary" when she transferred to UPMC Braddock. (Doc. No. 43, Plaintiff's Affidavit, ¶ 5.) However, Plaintiff does not dispute

4

employee who incurred seven or more instances of tardiness and/or more than nine unauthorized absences in a rolling 12-month period was subject to discharge.

Just one week after she transferred to UPMC Braddock, Ms. Lichtenstein sent an e-mail to Ms. Harris regarding the schedule for September 23 through October 17, 2007, indicating times she could and could not work. On October 9, she amended her schedule for that period and also provided information about the hours she could work between October 18 and November 11, 2007. On October 11, she requested a change in her work hours for October 12 and asked that her normal 8-hour shift be cut to four hours on October 13 because she needed time to complete a school assignment. These changes were accommodated. But the same day, she requested changes in her schedule for at least four other days and asked to work an additional unscheduled shift so she could take another day off to finish a paper for school and prepare for midterms.

On November 26, well after the deadline for changes had passed, Plaintiff e-mailed Ms. Lidey, asking for changes in her schedule for December 1 and 8. By this time, Ms. Lichtenstein's erratic schedule had become apparent to other employees on 4-East. Another psychiatric technician e-mailed Ms. Harris on November 27, 2007,

_____

that during orientation she received a copy of the UPMC Braddock policy which clearly states that five minutes is the leeway allowed before an employee is considered tardy. (Defs.' App., Lichtenstein Depo. Exh. 7.)

alerting her to the fact that Plaintiff had told him she planned to
call off on December 1 if her request to get her schedule changed
for that day was unsuccessful.[3] On November 30, a different employee
e-mailed Ms. Harris, stating she had heard Ms. Lichtenstein say she
intended to call off on December 1 because she refused to work a double
shift on the weekend, and had told other people she either wanted
to attend a concert on Saturday, December 1, or had a paper due the
following Monday.

By November 29, Ms. Lidey had become aware of the rumor that
Ms. Lichtenstein wanted time off to attend a concert on December 1,
and sent an e-mail in which she stated

> . . .I am concerned because I am now hearing that you would
> like Saturday evening off to attend a concert. I am able
> to work around your school schedule as I told you I would
> but you will need to schedule your other activities around
> your work schedule. If you have requests for the schedule
> they must be submitted by the request dates. I have other
> staff with requests that I must also consider.

(Appendix to Motion for Summary Judgment, Doc. No. 35, "Defs.' App.,"

Exh. B, Deposition of Deborah Lidey, "Lidey Depo.," Exh. 46.)

Ms. Lichtenstein replied that she was not intending to go to

a concert, but was "in a bind right now" with a project that was due

---

[3] Plaintiff was scheduled to work a double shift on December 1.
Defendants contend she had requested to work these hours; Plaintiff asserts
that she had not. Plaintiff does not mention being scheduled against her
wishes for this double shift in her response to Ms. Lidey's e-mail of
November 29, 2007. (See Defs.' App., Exh. F, Declaration of Amy Harris,
Exh. A.) No matter how or why this schedule was determined, there is no
question that Plaintiff was scheduled to work 16 hours on December 1. The
reason for that schedule is irrelevant to the analysis herein.

6

on Tuesday, December 4. The project required a group effort with two other students and the only time they could schedule a working session to write a paper and prepare presentations was the evening of December 1. Ms. Lidey did not grant the request for time off.

On December 1, Ms. Lichtenstein called off from the entire 16-hour shift (not just the evening) by e-mailing the person who would be in charge during the shift, but she did not refer to class obligations or the concert. Instead, she stated she was ill and had a doctor's note that prohibited her from returning to work until Sunday, December 2.

Requests for time off during the holiday period between December 9, 2007, and January 5, 2008, were required to be submitted by November 15, 2007. Plaintiff received at least two notices about this, but the day after the deadline, that is, on November 16, 2007, Ms. Lichtenstein again requested changes to the schedule, asking to take off December 30, 2007, through January 2, 2008, because she had purchased tickets for a concert in Philadelphia on December 31. Ms. Lidey informed her she was not able to accommodate all the requested time off, but did adjust the schedule so Ms. Lichtenstein was off on December 31 through January 2. On December 30, Ms. Lichtenstein was scheduled to work a regular daylight shift, i.e., from 7:00 a.m. to 3:30 p.m., but she did not report to work until 9:30 a.m. and left at 12:45 p.m. In other words, she was two and one-half hours late

7

beginning her shift and left almost three hours early.

At the time, Ms. Lidey was about to begin her own vacation, scheduled for December 31 through January 6. During her absence, Ms. Krautz was the acting supervisor for employees on 4-East. Plaintiff was scheduled to return to work for the evening shift, i.e., from 3:00 p.m. to 11:30 p.m., on January 3, 2008.[4] However, early that morning, her mother, Jodi Black, was taken to the hospital with severe pain in her right leg. Ms. Lichtenstein contacted the nursing supervisor and told her she was unable to work that day because she was at the emergency room with her mother. Shortly after noon on January 3, Ms. Krautz sent an e-mail to Ms. Harris and Ms. Lidey informing them that Ms. Lichtenstein had called off but that another employee had been able to replace her; the reason for the call off did not appear in the e-mail. Plaintiff reported to work as scheduled on January 4 while her mother was still hospitalized.

According to their deposition testimony, Ms. Lidey and Helene Brown, the UPMC Braddock vice president of Human Resources, had talked before Ms. Lidey went on vacation about terminating Ms. Lichtenstein's employment. Ms. Lidey returned to the office on January 7 as scheduled and immediately asked Ms. Harris to provide her with a list of the dates on which Plaintiff had been tardy or

---

[4] As discussed in detail below, Plaintiff vigorously disputes the timing of all events beginning on January 3, 2008.

called off. The list showed that she had called off sick on November 13, had failed to report on December 1 when she was scheduled to work the 16-hour shift, and had called in on January 3 because of a "sick mom." She had been tardy six times: October 13, November 28, December 7, 15, 29, and January 4. The list did not include December 30 when Plaintiff arrived late and left early. (Defs.' App., Lidey Depo. Exh. 58.)

Ms. Lidey and Ms. Brown again discussed Ms. Lichtenstein's attendance problems, and agreed to proceed with the termination on January 8 when Plaintiff was next scheduled to work. However, about 3:00 a.m. that day, Ms. Lichtenstein called the night nursing supervisor, stating that her mother was still hospitalized and she was "just exhausted" from the situation. She told the supervisor she would not be able to work later that day and needed to take a leave of absence. She asked whom she should contact and the supervisor told her to talk with Ms. Brown.

Instead of contacting Ms. Brown, Ms. Lichtenstein e-mailed Ms. Lidey shortly after noon on January 8, stating,

> I am not sure if you are aware, but my mother has been in the hospital since Thursday [January 3]. I am not sure how much longer they will keep her hospitalized. And once she is released, she might require some assistance. Under these circumstances and at this point in time, I would like to, as well as need to, take a leave of absence. Who do I speak with to aid me in this process?

(Plaintiff's Deposition Exhibits, Doc. No. 47, "Plf.'s Exhs.," Exh.

9

A, Lichtenstein Depo. Exhs. at 1.)

Early the next morning, Ms. Lidey replied to this e-mail, stating she was out of the office on January 9 and asking Plaintiff to make an appointment through Ms. Harris; it was scheduled for 11:00 a.m. on January 10. At 9:00 that morning, Ms. Lichtenstein called to change the appointment because her mother was home from the hospital and needed assistance taking medications during the day. Ms. Lidey, Ms. Krautz and another supervisor called Ms. Lichtenstein later that morning and advised her that her employment was being terminated due to tardiness, absenteeism, and constant difficulty in accommodating her schedule.

## B.  Procedural Background

On October 6, 2009, Plaintiff filed a two count complaint against UPMC, WPIC, UPMC Braddock, and Ms. Lidey. In Count I, Ms. Lichtenstein claims she was illegally denied FMLA leave to care for her seriously ill mother, as provided in 29 U.S.C. § 2615(a)(1). (Amended Complaint, Doc. No. 10, ¶¶ 36-49.) In Count II, Plaintiff alleges she was unlawfully discharged for requesting family medical leave and/or taking time off to care for her mother in violation of 29 U.S.C. § 2615(a)(2). Following two unsuccessful attempts at mediation and almost a year of discovery, on February 25, 2011, Defendants filed the now-pending Motion seeking summary judgment in their favor on both Counts. The parties having briefed all issues

10

thoroughly, the Motion is now ripe for decision.

## II. **JURISDICTION AND VENUE**

This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2). Venue is properly laid in the Western District of Pennsylvania inasmuch as the events giving rise to the claims herein occurred in Allegheny County, Pennsylvania, within this district. *See* 28 U.S.C. § 1391(b)(2).

## III. **STANDARD FOR SUMMARY JUDGMENT**

A court may grant summary judgment if the party so moving can show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); Sollon v. Ohio Cas. Ins. Co., 396 F. Supp.2d 560, 568 (W.D. Pa. 2005). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

In considering a motion for summary judgment, the court must view all evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and draw all reasonable inferences and resolve any conflicts in its favor. Sollon, id., *citing* Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio

11

Corp., 475 U.S. 574, 587 (1986), and Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). In short, the movant must show that if the pleadings, depositions and other evidentiary material were admissible at trial, the other party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the movant's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

Once the movant has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." Celotex, id. at 322-323; Sollon, id.; Fed.R.Civ.P. 56(c). The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations, or mere suspicious beliefs. Liberty Lobby, id. at 250-252; Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).

**IV. ANALYSIS**

A. Relevant Law

In 1993, Congress enacted the FMLA to accommodate "the important societal interest in assisting families, by establishing a minimum labor standard for leave." Churchill v. Star Enters., 183

12

F.3d 184, 192 (3d Cir. 1999), *quoting* S. Rep. No. 103-3 at 4, 1993 U.S.S.C.A.N. at 6-7. This goal is accomplished, in part, by providing employees the right to "reasonable leave for medical reasons," not only for their own medical conditions, but also to care for "a child, spouse or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2); *see also* 29 C.F.R. § 825.201, Leave to Care for a Parent. Thus, "covered employers" are required to grant up to 12 weeks of unpaid leave during a 12-month period to any "eligible employee" for such medical purposes.[5] 29 U.S.C. § 2612(a)(1)(C); 29 C.F.R. § 825.200(a). The leave may be continuous or intermittent and intermittent leave "may include leave of periods from an hour or more to several weeks." 29 C.F.R. § 825.202.

At the same time, the medical leave must be administered in a way that "accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3). This requires the employee to notify her employer of her need for leave. Under the relevant regulation, "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and

[5] An "eligible employee" is one who has worked for a covered employer for at least 12 months and for at least 1,250 hours during the previous 12 months. 29 U.S.C. § 2611(2). A "covered employer" is "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i). The parties do not dispute that Ms. Lichtenstein qualified as an eligible employee of UPMC (despite the transfer from WPIC to UPMC Braddock in September 2007) and that UPMC is a "covered employer."

13

the anticipated timing and duration of the leave." 29 C.F.R. §
825.302(c). This notice is the threshold requirement in all FMLA
cases. *See* Scott v. UPMC, No. 10-3667, 2011 U.S. App. LEXIS 13479,
\*8-\*9 (3d Cir. July 1, 2011), *citing* Brohm v. JH Properties, Inc.,
149 F.3d 517, 523 (6th Cir. 1998) ("nothing in [the FMLA] places a
duty on an employer to affirmatively grant leave without such a
request or notice by the employee.") Where the need for leave is
foreseeable -- for example, in the case of scheduled surgery and a
subsequent period of recovery -- an employee must give the employer
30 days advance notice or, if this amount of notice is impossible,
then "as soon as practicable." 29 U.S.C. § 2612(e); 29 C.F.R. §
825.302. In unforeseeable situations -- such as herein when
Plaintiff's mother woke one morning and collapsed from severe leg
pain -- the regulations require the employee to notify the employer
"as soon as practicable under the facts and circumstances of the
particular case," according to the employer's "usual and customary
notice and procedural requirements." 29 C.F.R. § 825.303.
Another regulation provides alternatively that if an employee
becomes aware of the need for leave less than 30 days in advance,
she should notify her employer "either the same day or the next
business day." 29 C.F.R. § 825.302(b); *see also* 29 U.S.C. §
2612(e)(1). An important factor related to unforeseeable leave
requests is that "[w]hen an employee seeks leave for the first time

14

for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b); *see also* Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007) ("In providing notice, the employee need not use any magic words.")

An employer may violate the FMLA in two ways, commonly referred to as interference and retaliation. An employee alleging she was discharged in violation of the FMLA may proceed under either or both theories. Hayduk v. City of Johnstown, Nos. 09-3846 and 09-3948, 2010 U.S. App. LEXIS 13630, *8 (3d Cir. July 2, 2010), *cert. denied*, 131 S. Ct. 1002 (2011). Interference claims are based on the FMLA regulations which explain that an employer interferes with the employee's rights by refusing to authorize FMLA leave or discouraging an employee from using such leave. 29 C.F.R. § 825.220(b); *see also* 29 U.S.C. § 2615(a)(1) (it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the FMLA.) "[T]o assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." Sarnowski, 510 F.3d at 401; Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005), *citing* 29 U.S.C. §§ 2612(a) and 2614(a); *see also* Kerns v. Drexel Univ., No. 06-5575, 2008 U.S. Dist. LEXIS 57358, *34 (E.D. Pa. Jul.

25, 2008) (including an additional element, i.e., that the employee gave notice to the defendant of her intention to take FMLA leave.) The plaintiff need not establish that she was treated differently than others and, unlike a case in which the plaintiff is pursuing a claim for discriminatory retaliation (discussed below), the defendant cannot escape liability by providing a "legitimate business purpose" for the decision. Callison, 430 F.3d at 120 ("An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.")

The requirements for stating a claim of retaliation are somewhat different and arise under a different provision of the FMLA. Section 2615(a)(2) makes it illegal for an employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FLMA. To assert a retaliation claim, a plaintiff must demonstrate: (1) she was a covered employee who invoked her rights to FMLA benefits; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the exercise of her FMLA rights. *See* Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). Assuming there is insufficient direct evidence that the plaintiff's FLMA leave (or a request therefor) was a substantial factor in the decision to take the adverse action, thereby invoking the analysis established in

16

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), a court analyzing a retaliation claim applies the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). That is, (1) the plaintiff must establish a *prima facie* case of discrimination (here the alleged retaliatory dismissal;) (2) the defendant must come forward with a legitimate, nondiscriminatory reason for the adverse employment action; and (3) assuming the defendant meets this burden, the plaintiff must show by the preponderance of the evidence that the defendant's proffered reason was a pretext for discrimination. McDonnell Douglas, 411 U.S. at 802-805; *see also* Parker v. Verizon Pa., Inc., No. 07-4829, 2009 U.S. App. LEXIS 2508, *10 (3d Cir. Feb. 4, 2009), applying the McDonnell Douglas paradigm in the context of an FMLA retaliatory discharge claim.

As the Third Circuit Court of Appeals has recently clarified, "it would be patently absurd if an employer who wished to punish an employee for taking FMLA leave could avoid liability simply by firing the employee before the leave begins." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508 (3d Cir. 2009). Therefore, "firing an employee for [making] a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Id. at 509. An employee may bring suit to enforce either type of claim pursuant to Section 2617(a) of the FMLA.

17

Conoshenti, 364 F.3d at 141.

## B. Plaintiff's Claims

In Count I of her Amended Complaint, captioned as Denial of Leave of Absence, Plaintiff alleges that her need to call-off on January 3 and January 8, 2008, as well as her request for a leave of absence, were necessary to assist her mother who was suffering from a serious health condition. (Amended Complaint, ¶¶ 39, 42.) Defendants' denial of the FMLA leave she requested was a violation of 29 U.S.C. § 2615(a)(1).

In Count II, described as Unlawful Discharge, Plaintiff alleges that Defendants violated the FMLA by "unlawfully discharging Plaintiff for needing family medical leave and/or requesting family medical leave and/or taking time off due to a serious health condition of a parent of which Defendants were aware." (Amended Complaint, ¶ 51, citing 29 U.S.C. § 2615(a)(2).) In both Counts, Plaintiff claims to have been injured by the loss of wages, benefits, and health insurance, for which she seeks compensatory damages, interest, liquidated damages, reinstatement (or in the alternative, front pay), a permanent injunction against further violation of her rights under the FMLA, and reasonable attorney's fees and costs.

Since Plaintiff explicitly cites Section 2615(a)(1) in Court I and Section 2615(a)(2) in Count II, we assume that Count I is a claim for interference with her FMLA rights and Count II is a claim

18

for retaliation for exercising her rights when she requested FMLA leave. The parties begin their analyses with the retaliation claim in Count II and we shall follow suit.

## C. Retaliation for Seeking FMLA Leave

1. *Direct evidence of retaliatory animus:* Defendants argue only in a footnote that Plaintiff has not come forth with direct evidence of retaliation, and that therefore only the McDonnell Douglas framework is applicable. (Memorandum of Law in Support of Defendants' Motion for Summary Judgment, Doc. No. 37, "Defs.' Memo," at 7, n.4.) Plaintiff, on the other hand, contends she has direct evidence of retaliation, namely, the fact that she requested FMLA-qualifying leave on January 3, 2008, and was terminated just one week later after Ms. Lidey placed "substantial negative reliance" on this request.

"Direct evidence" is evidence sufficient to allow the jury to find that "the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring.) When proceeding under this theory, "the plaintiff must produce evidence sufficient to show that an illegitimate criterion was a substantial factor in the particular employment decision such that a reasonable fact finder could draw an inference that the decision was made 'because of' the plaintiff's protected status." Id. at 278. This

19

requires the plaintiff to present evidence of "discriminatory attitudes" that were "causally related" to the challenged employment decision. Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004). Such discriminatory attitudes can be shown through conduct or statements by the decisionmakers which provide circumstantial evidence that an impermissible motive underlay the decision. Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 (3rd Cir. 1995). A plaintiff confronts a "high hurdle" in attempting to prove discrimination by direct evidence. Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998) (internal citation omitted.) But, if a plaintiff does provide such evidence, the burden of persuasion on the issue of causation shifts to the employer to prove that it would have treated the plaintiff the same even if it had not considered the protected factor. Glanzman, 391 F.3d at 512, *citing* Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002).

Plaintiff's direct evidence argument involves two steps. According to Ms. Lichtenstein, the evidence shows that after she called off from work on January 3, 2008, she continued to care for and emotionally support her mother while she remained in the hospital through January 10. The notice on January 3 was given "as soon as practicable under the facts and circumstances" of the situation when her mother was unexpectedly taken to the hospital early that morning. Ms. Lichtenstein, who was scheduled to begin work at 3:00 p.m. that

20

day, called the nursing supervisor at least two hours in advance (thus complying with UPMC Braddock policy) and told the supervisor, "I was currently in the emergency room, that my mother had been brought into the hospital via ambulance and I would be unable to work that day." (Defs.' App., Exh. 1, Deposition of Jamie Lichtenstein, "Lichtenstein Depo.," at 151.) Plaintiff contends this was sufficient notice that she was seeking FMLA-qualified leave. (Plaintiffs' [sic] Brief in Opposition to Defendant's [sic] Motion for Summary Judgment, Doc. No. 42, "Plf.'s Brief," at 6-9.)

Then in step two, Plaintiff relies on an indirect reference to her FMLA request in Defendants' response to a charge of discrimination she brought to the Equal Employment Opportunity Commission ("EEOC") prior to filing suit in this matter. In that document, Defendants asserted, "By January 4, 2008, Ms. Lichtenstein had been absent three times (including once for a 16-hour shift) and tardy six times." According to Plaintiff, the exhibit provided with Defendants' response to support this statement is the staff log maintained by Ms. Lidey's assistant, Ms. Harris. (Defs.' App., Lidey Depo. Exh. 58.) The log shows two absences in 2007, including December 1, when she called off from the scheduled 16-hour shift,[6] and two dates in 2008 on which took unscheduled time off, January

---

[6] As noted in the Factual Background section above, this was the date Ms. Lichtenstein purportedly told co-workers she would deliberately call off if her request for time off was not approved.

21

3 and January 8, each time indicating "sick mom." According to Plaintiff, to support their argument that Plaintiff was dismissed for excessive absenteeism and tardiness, Defendants had to have illegally included the FMLA-protected absence on January 3, 2008, in their calculation. (Plf.'s Brief at 9-10; see also 29 C.F.R. § 825.220(c), stating that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as. . .disciplinary actions.")

We agree with Defendants that Ms. Lichtenstein's telephone call on January 3 did not constitute an adequate request for leave under the FMLA. As Defendants point out, the fact that a family member has been taken to the emergency room does not necessarily reflect a serious medical condition sufficient to support a request for leave under the FMLA. (Defs.' Memo at 16-17.) Accepting as fact that Ms. Lichtenstein made the above statement to the nursing supervisor on January 3, nothing therein implies a request for FMLA leave, only that she was "unable to work that day." FMLA regulations state that an employee seeking leave must provide "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). The fact that Ms. Black was "in the emergency room," does not, standing alone, reflect a serious medical condition as that term is defined in the FMLA, which requires either "impatient care in a hospital, hospice, or

22

residential medical care facility" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11) and 29 C.F.R. § 825.113. While the condition precipitating an emergency room visit may be serious, e.g., a broken bone or an adverse reaction to medication, the condition might not require ongoing hospitalization or medical treatment. As another member of this Court has pointed out in a similar case where an employee called in and simply left a message that she would not be at work because she had to take her mother to the emergency room,

> [e]ven under the liberal notice requirements of FMLA, these facts fall far short of meeting an employee's obligation to provide reasonably adequate information to apprise an employer of the need for FMLA leave to care for a family member with a serious health condition. All that the record demonstrates is that [the plaintiff] took a day off to take her mother to the hospital. She provided no additional information to Pharmacare that would raise [the] specter that FMLA leave might be required.

Phinizy v. Pharmacare, 569 F. Supp.2d 512, 523 (W.D. Pa. 2008).

Moreover, there is no evidence Ms. Lichtenstein took any action to follow-up on this purported FMLA notice when she returned to work the following day nor at any other time between January 4 and January 7. Like other employees, she had been advised via e-mail that Ms. Lidey would be on vacation between December 31, 2007, and January 6, 2008 (see Defs.' App., Lidey Depo. Exh. 65), but there is no evidence she attempted to contact Ms. Krautz (who was covering Ms. Lidey's responsibilities at the time) to clarify that she had

23

requested FMLA leave for January 3 and might need additional time off to care for her mother. Although the extent of the information an employee must convey to an employer regarding the need for FMLA leave is relatively light, "[t]he FMLA does not require an employer to be clairvoyant." Brenneman v. MedCentral Health Sys., 366 F.3d 412, 428 (3d Cir. 2004). Finally, Plaintiff testified at her deposition that the "first time I asked for [FMLA] leave. . .was January 8, 2008," when she sent an e-mail to Ms. Lidey "around noon."[7] (Defs.' App., Lichtenstein Depo. at 7.) Even in that e-mail, she makes no mention of intending to ask for FMLA leave for her absence on January 3.

Turning to Plaintiff's second example of direct evidence, we conclude that Defendants' response to Ms. Lichtenstein's EEOC charge is no more damaging. In Tamayo v. Deloitte & Touche, LLP, the plaintiff also claimed there was direct evidence of retaliatory animus underlying her termination, specifically a memo by her supervisor that referred to attendance problems over a period of several months, described those problems as "a significant concern," and advised her that this behavior had to change. Tamayo, CA No.

---

[7] Ms. Lichtenstein immediately amended this statement and testified that she had asked about how to apply for such leave when she called the night supervisor about 3:00 a.m. on January 8. (Defs.' App., Lichtenstein Depo. at 7-9.) This time difference is immaterial since there is no evidence the unidentified night supervisor played any role in her termination or the alleged denial of FMLA leave or that she conveyed this request to Ms. Lidey before Plaintiff sent the e-mail to her later that day.

05-3364, 2007 U.S. Dist. LEXIS 2878, *20-*21 (D. N.J. Jan. 16, 2007). Some of Tamayo's absences had been related to her mother's illness, but the supervisor did not distinguish between FMLA-related absences and other attendance problems in the memo. Tamayo argued that "since Defendant did not separate her FMLA absences from any other non-protected absences, it cannot contend that it did not consider her FMLA-protected absences when it decided to terminate her." Id. at *21. The court rejected this argument as direct evidence of a retaliatory animus, explaining,

> General statements made by [plaintiff's supervisors] regarding Tamayo's attendance and performance problems, in light of the fact that she had a prior history of attendance issues and allegedly missed a number of days unrelated to her mother's illness, do not unambiguously reflect a retaliatory animus to terminate Tamayo for taking leave to care for her mother.

Tamayo, 2007 U.S. Dist. LEXIS 2878 at *22.

We likewise reject Plaintiff's argument that Defendants' EEOC response improperly included January 3 as an absence taken into account in the termination decision because there is no evidence Plaintiff adequately advised anyone that she had intended (or should have been permitted after the fact) to take FMLA leave on that date. To the extent then, that Plaintiff bases her claims on direct evidence, her evidence fails to satisfy the criteria of the Price Waterhouse analysis. We therefore move on to consideration of Plaintiff's retaliation claim under the burden-shifting framework

25

of McDonnell Douglas.

2.  *Indirect evidence of discriminatory retaliation:*
Defendants argue that Plaintiff's claim that she was retaliated
against when she requested FMLA leave in January 2008 fails because
she cannot establish either the first or third prongs of the test
set out in Conoshenti (as modified by Erdman) for stating a claim
for retaliatory discharge.  That is, Plaintiff has failed to produce
evidence that she took – or, at a minimum, invoked her right to –
FMLA leave as of January 3, 2008, and that the termination was
causally related to this request.  Conoshenti, 364 F.3d at 146;
Erdman, 582 F.3d at 509 ("we interpret the requirement that an
employee 'take' FMLA leave to connote invocation of FMLA rights, not
actual commencement of leave.")  We agree with Defendants on this
point as discussed in the previous section and need not revisit it
again.  That does not, however, resolve the issue of Plaintiff's
request of January 8, 2008, which explicitly refers to leave in order
to care for her mother when she was released from the hospital and
which irrefutably was sent just two days before she was fired.

As noted above, the third requirement for successfully stating
a claim of FLMA retaliation is a causal connection between the
exercise of the plaintiff's FLMA rights and the adverse employment
action.  Defendants argue that Ms. Lichtenstein cannot establish
this third prong – even if we take into account the e-mail of January

8, 2008 – because the decision to terminate her employment was made before Ms. Lidey left for vacation on December 31. Defendants rely on Ms. Lichtenstein's well-documented history of asking for special consideration to accommodate her school-related activities (not only attending classes); her chronic and frequent late requests for changes to the schedule; conflicting stories about whether she called off on December 1 because she needed time to collaborate with other students to finish a paper and presentation or wanted to attend a concert; the fact that she was tardy five times between October 13 and December 29, 2007; and the "last straw" when she was denied another post-deadline request for time off on December 30, 2007, then – without permission -- arrived more than two hours after the beginning of her shift and left almost three hours early.[8] (Defs.' Memo at 8-12.)

Moreover, Defendants argue, even if Ms. Lichtenstein were able to convince the Court that she has established her *prima facie* case of retaliatory discharge, Plaintiff has failed to show that their

---

[8] Plaintiff provides an affidavit in which she states that "to the best of [her] current recollection, [she] had permission to leave early on December 30 and to come in later than scheduled." (Doc. No. 43, Exh. A, ¶ 8.) However, it is well-established that to survive a motion for summary judgment, the non-movant may not rely on unsupported assertions. Liberty Lobby, 477 U.S. 250-252. At her deposition, Ms. Lichtenstein acknowledged that she only worked from 9:30 a.m. until 12:45 p.m., but could not recall why she came in late or left early; she did not mention having been given permission to adjust her hours from a regular shift. (Defs.' App., Lichtenstein Depo. at 124.)

consistent, legitimate, non-retaliatory reason for her termination, i.e., chronic repeated tardiness and absenteeism during her probationary period, is mere pretext. That is, Plaintiff has failed to identify any direct or circumstantial evidence from which the finder of fact could reasonably either (1) disbelieve Defendants' stated reasons for her termination or (2) believe that "an invidious discriminatory reason was more likely than not a motivating or determinative cause" of the termination. (Defs.' Memo. at 19, *quoting* Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).)

In her response to Defendants' argument regarding her failure to establish the first requirement for stating a *prima facie* case of retaliation, Plaintiff relies almost entirely on the FMLA leave request she purportedly made on January 3, 2008, while referring only in passing to the e-mail sent to Ms. Lidey on January 8. (Plf.'s Brief at 11-13.) She concentrates instead on the argument that Defendants have failed to proffer a legitimate non-discriminatory reason for her dismissal with "sufficient clarity" to entitle them to summary judgment. Specifically, Plaintiff cites a number of excerpts from Ms. Lidey's testimony to support the argument that she repeatedly contradicted herself regarding the date on which she had decided to terminate Plaintiff's employment, that is, whether it was December 1 when Ms. Lichtenstein called off after being denied time off; before Ms. Lidey left for vacation on December 31; after she

learned via e-mail on January 3 that Plaintiff had worked only slightly more than three hours of an 8-hour shift on December 30; when she returned from vacation on January 7; or on January 8 after she received Plaintiff's e-mail regarding leave to care for her mother. (Plf.'s Brief at 13-22.) She also notes Ms. Lidey's inability to remember dates on which she had discussed termination with Helene Brown from Human Resources; an e-mail message on December 24, 2007, in which Ms. Lidey thanked Ms. Lichtenstein for working 12-hour shifts on December 24 and 25 (implying, at least to Plaintiff, that no decision about termination had been made by that time); and the fact that on December 31, 2007, Ms. Harris had acknowledged a request from Ms. Lichtenstein to schedule vacation in March 2008 (implying that there was no intention to fire her at that point if she were allowed to make plans so far in advance.) (Id.) The most damaging evidence of retaliatory intent, according to Ms. Lichtenstein, is the fact that on January 9, Ms. Lidey responded to her e-mail requesting more information about taking leave by asking her to call Ms. Harris to schedule a time to come in and meet with her on January 10. (Plf.'s Exhs., Amy Harris Deposition Exh. 12.) This e-mail, she argues, is conclusive evidence that Ms. Lidey was aware of her request for FMLA leave before she initiated the termination action which eventually took place on January 10, contrary to Ms. Lidey's deposition testimony that "I terminated Jamie

29

by telephone before I knew anything about her mom being ill or needing to ask for leave." (Plf.'s Brief at 18-20; *quoting* Defs.' App., Lidey Depo. at 139.)

While Plaintiff has presented a great deal of argument about the shortcomings of Ms. Lidey's testimony, she has somewhat missed the point of the second step of the McDonnell Douglas framework. We shall assume for purposes of analysis that Plaintiff has satisfied step one and established a *prima facie* case of discriminatory retaliation based on the fact that her employment was terminated only two days after she requested leave. The burden now shifts to Defendants to rebut the presumption of retaliation. The Supreme Court has explicitly outlined how this is accomplished:

> The defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [adverse employment action.] The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's *prima facie* case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-255 (1981).

"The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for

the adverse employment action." Shellenberger v. Summit Bancorp. Inc., 318 F.3d 183, 189 (3rd Cir. 2003) (internal modification omitted.) The Court does not conduct a credibility assessment at this point. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). And, it is important to point out, at all times in the McDonnell Douglas analysis, the burden of persuasion rests with the plaintiff. Smith v. City of Allentown, 589 F.3d 684, 690 (3d Cir. 2009).

Here, Defendants have clearly and repeatedly stated that Ms. Lichtenstein was terminated as a result of her absences, tardiness, and difficulty accommodating her scheduling requests. The evidence presented includes the following:

- contemporary written evidence regarding Ms. Lichtenstein's plan to deliberately call off on December 1 after she was denied leave for that day;[9]

- deposition testimony from Ms. Lidey, Ms. Brown, and Ms. Krautz about Plaintiff's unscheduled absences

---

[9] See e-mail from co-worker Keather Likins dated November 27, 2007, to Ms. Harris in which he stated: "Jamie, from 4 E asked me to work a double for her on Sat [December 1], I explained I was already working a double. She told me she was going to call off on Sat. I told her that was not cool. . . .I just wanted to give you a heads up on this. If there is any way you can keep this on the down low between me, you and Debbie [Lidey], I would appreciate it. If not; it's ok as well as I don't appreciate someone planning a 'call-off' especially when they request the hours she does." (Defs. App., Exh. G, Declaration of Deborah Lidey, Exh. A.) See also e-mail from Ms. Lichtenstein dated December 1, 2007, in which she offered yet another reason for calling off, i.e., "I won't be in today. . . I also have a doctor's note that does not permit me to return to work until Sunday." (Defs.' App., Exh. H, Quesnelle Declaration, Exh. A.)

and scheduling difficulties; [10]

- numerous e-mails from Ms. Lichtenstein requesting schedule accommodations, many made after the date on which the schedules were set for the entire staff;[11]

- the response to Ms. Lichtenstein's EEOC charge of discrimination, stating that the reason for her termination was "numerous incidents of tardiness and absenteeism;" the fact that she was "a 'nightmare' to schedule according to Amy Harris;" and the fact that "[a]lthough the hospital was willing to accommodate her school schedule, Ms. Lichtenstein was also constantly requesting days off to study or complete schoolwork." (Plf.'s Exhs., Lidey Depo. Exh. 66.)

In addition, Plaintiff herself testified at her deposition as follows when asked about the telephone call from Ms. Lidey on January 10, 2008, telling her that her employment was terminated:

Q:   Tell me about that phone call.

A:   [Ms. Lidey] called me.  She said that she had me on speakerphone and Cynthia Krautz was present and another supervisor.  She said that she was firing me due to my absenteeism, tardiness, and difficulty accommodating my school schedule.

---

[10] *See,* as examples only, Defs.' App., Lidey Depo. at 126 ("In December, that's when I started to pay close attention to Jamie's call-offs and her requests for adjusting a schedule after she had given me many additional requests"); Brown Depo. at 34-35, explaining that in her first conversation with Ms. Lidey about the reasons for Plaintiff's termination, "What I recall is [Ms. Lidey] recounting to me the time and attendance issues of Jamie's and the multiple requests for scheduling changes"); Exh. E, Deposition of Cynthia Krautz, at 40-41, stating that when Ms. Lidey returned from vacation on January 7, she had discussed the reasons for Ms. Lichtenstein's termination, i.e., "calls off. . . [Plaintiff] was very demanding about her scheduling. . .there was some bargaining constantly, and it was just really difficult.")

[11] *See,* e.g., Plf.'s Exhs., Exh. A, Lichtenstein Exhs. 13-14, 16-19 and Exh. B, Lidey Depo. Exh. 49.

\* \* \* \* \* \*

Q:    Did she tell you, other than what you just testified,
      what factors she considered in deciding to terminate
      your employment?

A:    Absenteeism,    tardiness,    and    difficulty
      accommodating my schedule.

Q:    Anything beyond that?

A:    No, not to --- not to my recollection.

(Defs.' App., Lichtenstein Depo. at 147-148.)

Thus, contrary to Plaintiff's argument that Defendants' reasons

for her termination were not stated with "sufficient clarity" to

entitle them to summary judgment, we conclude those reasons could

not be more clearly or more consistently articulated and that

Plaintiff was undoubtedly told those exact reasons at the time.

The burden now shifts back to Plaintiff to show that

"discriminatory animus motivated the employer." Fuentes, 32 F.3d

at 765. It is not enough merely for the fact finder to disbelieve

the proffered reasons for the employment action; he or she must

affirmatively believe the plaintiff's contention that the action was

taken on the basis of an impermissible discriminatory criterion.

St. Mary's Honor Center, 509 U.S. at 519. To satisfy her burden and

avoid summary judgment at this stage of the analysis, Plaintiff must

point    to    "weaknesses,    implausibilities,    inconsistencies,

incoherencies, or contradictions in the employer's proffered

33

legitimate reasons" from which the factfinder could infer "that the employer did not act for [the asserted] non-discriminatory reasons." Fuentes, 32 F.3d at 765 (internal quotations omitted.) This evidence must be such that a reasonable fact finder could either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 764.

Considering the second alternative for demonstrating pretext, the plaintiff's evidence must provide "sufficient probative force" to allow the fact finder "to conclude by a preponderance of the evidence that engaging in the protected activity was a motivating or determinative factor in the employment action." Paul v. UPMC Health Sys., No. 06-1565, 2009 U.S. Dist. LEXIS 19277, *54-*55 (W.D. Pa. Mar. 10, 2009). In Paul, the court identified three types of relevant evidence which satisfy this test, namely, evidence that the employer:

(1) previously discriminated against the plaintiff,

(2) has discriminated against other people who engaged in the same protected activity as plaintiff or has discriminated against other people within another protected class, or

(3) has treated more favorably similarly situated persons who did not engage in plaintiff's protected activity.

Id. at *55, *citing* Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998).

Plaintiff has not come forward with any evidence in these categories. We turn therefore to the question of whether Ms. Lichtenstein has presented evidence which would cause a fact finder to disbelieve Defendants' proffered legitimate reason for her dismissal. Plaintiff relies on two factors in attempting to satisfy this burden: inconsistencies in Ms. Lidey's testimony about when the decision was made to terminate her employment and the timing of her termination just two days after she had requested FMLA leave.

It is true that inconsistency may be considered as evidence of pretext. Fuentes, 32 F.3d at 765. However, taken as a whole, Ms. Lidey's testimony does not offer inconsistent *reasons* for Ms. Lichtenstein's termination; the reason is consistently her attendance and scheduling problems. We agree she failed to state in her testimony a specific date on which the decision was made to terminate Ms. Lichtenstein's employment. But considering her testimony and the other evidence chronologically, her testimony is not so much inconsistent as it is vague as to the date on which certain events took place three years earlier. At one point, she testified that the date that "solidified" the decision for her was December 1, 2007, when Plaintiff called in after she had been denied the day off. She testified, "I had already made many accommodations in her

schedule and I had in my mind, if she calls off then we can't further this." (Defs.' App., Lidey Depo. at 125.) She also testified that the December 1 call-off "really got my attention and then the other employees are coming to me saying, 'You know, this isn't fair." (Id. at 172-173.) As discussed above, on November 16, 2007, Ms. Lichtenstein had once again made an untimely request for time off between December 30, 2007, and January 2, 2008. Ms. Lidey testified that the schedule for that period had already been posted and she could not give Plaintiff all the days she had requested. (Lidey Depo. at 164.) Yet, on December 30, Ms. Lichtenstein worked only part of her scheduled shift, arriving late and leaving early, apparently without authorization. Ms. Lidey referred to this episode in her testimony, stating that after this event, "I knew right then Jamie wasn't going to work out in that position." (Id. at 164, 173-174.)

It is unclear when Ms. Lidey learned that Plaintiff had called off on January 3, but even if she received Ms. Krautz's e-mail of that date immediately, it simply stated that Plaintiff had called off for the evening shift, and did not refer to the fact that the reason for doing so was her mother's hospitalization. (Defs.' App., Lidey Depo. Exh. 57.) The same e-mail chain shows that Ms. Lidey had to have received Ms. Krautz's information by January 7 when she returned to the office because on that day, she asked Ms. Harris to

identify the dates on which Ms. Lichtenstein had called off. Both Ms. Lidey and Ms. Brown testified that they discussed Ms. Lichtenstein's termination either "before New Year's" (Defs.' App. Lidey Depo. at 181) or, at the latest, soon after Ms. Lidey returned from vacation on January 7. (Defs.' App., Exh. D, Deposition of Helene Brown, "Brown Depo.," at 33-35.) In fact, Ms. Brown testified she knew the first conversation was prior to January 8 because they had agreed that Ms. Lidey would inform Plaintiff of her termination on that date. On January 8, Ms. Lidey told her, "We were going to have the conversation today but she called off." (Brown Depo. at 34-35.)

Plaintiff relies heavily on the fact that only a week elapsed between her first absence due to her mother's illness and her termination.[12] We agree with Plaintiff that it is "undisputed" she was terminated on the morning of January 10, 2008. We further agree that not later than January 9, 2008, Ms. Lidey had to have been aware of Ms. Lichtenstein's e-mail of January 8 asking about leave to care

---

[12]  Plaintiff also relies on the facts that when she was fired, she had already been scheduled to work during the two-week periods beginning January 6 and January 20, 2008, and her request for vacation in March 2008 had been approved.  According to Plaintiff, this is evidence that the decision to terminate her employment had to have been made after she asked for leave on January 3 and/or 8. (Plaintiff's Concise Statement of Facts, Doc. No. 43, ¶¶ 14-16.)  From the record, the staff schedule appears to have been made at least two weeks in advance, sometimes longer (see, e.g., Plf.'s Exhs., Lichtenstein Depo. Exh. 8) and vacation time was requested in December for all of the following year (see Plf.'s Exhs., Harris Depo. Exh. 9, Lidey Depo. Exh. 53.)  Thus, we do not find these scheduling factors persuasive evidence to support Plaintiff's argument.

for her mother because at 4:34 that morning, she e-mailed a response asking Ms. Lichtenstein to make an appointment with her on January 10. (Plf.'s Exhs., Harris Depo. Exh. 12.) What Plaintiff omits from her analysis is Ms. Brown's testimony that Ms. Lidey intended to terminate Ms. Lichtenstein when she came to work on the morning of January 8, but could not do so when after she called off at 3:00 that morning. (Defs.' App., Brown Depo. at 34-35.)

It is well-established that "the temporal proximity of plaintiff's protected conduct and his termination can raise an inference that there is a causal link between the two." Burch v. WDAS AM/FM, CA No. 00-4852, 2002 U.S. Dist. LEXIS 12290 at *33 (E.D. Pa. June 28, 2002); Baker v. United Def. Indus., No. 09-4273, 2010 U.S. App. LEXIS 25140, *17-*18 (3d Cir. Dec. 8, 2010) ("[W]hen a relatively brief interval separates an employee's protected conduct from the ensuing adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn." (Internal quotation omitted.) "However, timing alone will not give rise to an inference of retaliation. The court must examine the record as a whole in determining causation." Schlifke v. Trans World Entm't Corp., 479 F. Supp.2d 445, 452 (D. Del. 2007)(internal citation omitted.) "The Third Circuit has stated that 'the mere fact that adverse employment action occurs after [a protected activity] will ordinarily be

insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'" Reinhart v. Mineral Techs. Inc., No. 05-4203, 2006 U.S. Dist. LEXIS 89279, *33-*34 (E.D. Pa. Nov. 27, 2006), quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)). Temporal proximity, "standing alone, must be 'unusually suggestive of retaliatory motive before a causal link will be inferred.'" Baker, 2010 U.S. App. LEXIS 25140 at * 19, quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). "Moreover, an employer's decision to proceed 'along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.'" Baker, id., quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001); see also Burch, id. at *33 (plaintiff had not established retaliation when he was fired shortly after taking FMLA leave because the evidence showed the decision to terminate his employment for poor performance had been made some two weeks before his request.)

We conclude Plaintiff has failed to provide any evidence which would allow a rational fact finder to disbelieve Defendants' proffered reasons for her termination or to believe that her e-mail of January 8 was either the motive for or the determining factor in the decision to terminate her employment. As the court in Burch pointed out, "One cannot reasonably conclude that plaintiff was terminated for something which occurred after the decision to

terminate [her] was made." Id. at *33. Summary judgment is therefore granted to Defendants on Plaintiff's claim of retaliatory discharge.

## D.  Interference with Plaintiff's Right to FMLA Leave

As noted above, Count I of Plaintiff's Amended Complaint states a claim for interference with her right to FMLA benefits. Defendants argue that if the decision to terminate her employment was made before she sought leave to care for her mother, even if the actual termination did not take place until after she submitted her memo to Ms. Lidey on January 8, she was not entitled to such leave. We have already determined that Plaintiff's call on January 3, 2008, telling the nursing supervisor that her mother was at the emergency room and she would not be able to work that evening did not qualify as a request for FMLA leave, so again, we consider only the January 8 e-mail.

As noted above, an interference claim rests on two criteria: the plaintiff's entitlement to benefits under the FMLA and defendant's denial of those rights. Sommer v. Vanguard Group, 461 F.3d 397, 399 (3d Cir. 2006). Interference claims commonly arise where the employer asks the employee to request a different time period for his leave in order to accommodate the employer's own needs. See, e.g., Williams v. Shenango, Inc., 986 F. Supp. 309, 320-321 (W.D. Pa. 1997), or Shtab v. Greate Bay Hotel & Casino, 173 F. Supp.2d 255,

267-268 (D.N.J. 2001).[13] A second type of interference occurs when the plaintiff alleges the employer failed to sufficiently advise him of his rights under the FMLA. *See*, e.g., Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp.2d 490, 496 (E.D. Pa. 2010), or Welch v. Tri Rivers Consulting Servs., Inc., CA No. 09-1017, 2011 U.S. Dist. LEXIS 46791, *8 (W.D. Pa. Mar. 21, 2011). Third, as discussed above, an interference claim can also arise when the defendant terminates the plaintiff's employment between the time she requests FMLA leave and that leave begins. *See*, e.g., Erdman and Sarnowski, *supra*.

Ms. Lichtenstein testified that when her mother was sick and she asked about leave, "Nobody told me that I wasn't eligible. Nobody told me of proper procedures, nothing. I was just fired." (Defs.' App., Lichtenstein Depo. at 6.)  However, Plaintiff's interference claim does not allege a failure by Defendants to advise her about her rights. Nor is there any claim that she was asked to take alternative time to accommodate Defendants' work schedule.[14]

---

[13]  We recognize that where the need for leave is foreseeable, the FMLA requires the employee to "make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider." 29 U.S.C. § 2612(e)(2)(A).

[14] Plaintiff's brief in opposition to the motion for summary judgment is not helpful on the interference claim since her argument consists solely of a correct statement of the elements necessary to state such a claim and a reference to previous arguments.  The Amended Complaint provides little more guidance since the only allegation is that "Defendants violated the FMLA by unlawfully discharging Plaintiff for needing family medical leave and/or requesting family medical leave and/or taking time off due to a serious health condition of a parent of which Defendants were aware."

Although Erdman establishes that an interference claim can arise when an employee is terminated as a result of exercising her FMLA rights, courts have consistently recognized that in some circumstances, the termination and the request for FMLA leave may be related by nothing more than temporal proximity. In such cases, the courts have not hesitated to conclude that the plaintiff has failed to show he was entitled to FMLA benefits.

Moorer v. Baptist Mem'l Health Care Sys., 398 F.3d 469 (6th Cir. 2005), is illustrative. After having been employed by the defendant ("Baptist") for 17 years, Moorer was accused by two supervisors of having been intoxicated while on the job. Although he denied the accusation, he was told that if he did not immediately participate in a rehabilitation plan, he would be terminated. If he agreed to participate, he would be reinstated when he returned from the in-patient treatment. Despite this assurance, while he was undergoing treatment, Moorer's supervisors decided to terminate his employment based on a number of performance problems that came to light during his absence, and he was denied reinstatement. Moorer, 398 F.3d at 472-476. He sued for interference with his FMLA rights and the district court granted summary judgment in favor of Baptist. The Court of Appeals reversed, concluding in part that because the defendant had been aware of at least some of Moorer's alleged

(Amended Complaint, ¶ 51.)

performance deficiencies (many of which Moorer disputed) prior to his FMLA leave, the plaintiff had raised a genuine issue of material fact on the question of whether his dismissal would have occurred had he not taken FMLA leave. Id. at 489-490. In arriving at this conclusion, however, the Court explicitly noted that an employee could be lawfully dismissed, thereby preventing him from exercising his right to FLMA leave, "if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." Moorer, id. at 488 (internal citations omitted.) The Court went on to note that if the employer takes this position, the employee must "convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been discharged . . .if he had not taken FMLA leave." Id. at 488-489 (internal citations omitted.)

Moorer is not alone in this reasoning. See, e.g., Atchison v. Sears, 666 F. Supp.2d 477, 489-490 (E.D. Pa. 2009) (where the plaintiff failed to present evidence to contradict the employer's written evidence that it had included him in a reduction-in-force decision made weeks before he requested FMLA leave, his interference claim must be dismissed); Yandrisevitz v. H.T. Lyons, Inc., No. 08-1444, 2009 U.S. Dist. LEXIS 63735, *32 (E.D. Pa. July 22, 2009)(where the plaintiff did not dispute the defendant's business reasons for eliminating her position while she was on FMLA leave and

did not come forward with any evidence that the job would not have been eliminated if she had not taken leave, summary judgment was granted in favor of the defendant on her interference claim); and Reinhart, 2006 U.S. Dist. LEXIS 89279 at *39-*42 (where the decision to terminate the plaintiff's employment occurred immediately after a shouting match with his supervisor, but just hours before Reinhart requested a second FMLA leave, he was not entitled to that leave "because the 'wheels of termination' had already been put into motion" when the request was made.)

As discussed above, Plaintiff has not come forward with any evidence to refute Ms. Lidey's testimony that although she could not remember the exact date on which the decision was made to terminate Plaintiff's employment, it was before she was aware that her mother had been hospitalized. Moreover, Ms. Brown testified that Ms. Lichtenstein was not referred to Human Resources to complete the paperwork for an FMLA leave

> because we already made the decision to move forward with the termination. . . [T]he decision was made to terminate Jamie Lichtenstein, after that is when I knew that she had to be off or she called off to care for her mother. We didn't refer her, because in our minds, she's already going to be terminated; she is not eligible then for FMLA as a terminated employee.

(Defs.' App., Brown Depo. at 60-61.)

In short, like the plaintiff in Reinhart, by the time Plaintiff requested FMLA leave on January 8, 2008, the wheels of her termination

were already in motion.  We therefore grant summary judgment to Defendants on Plaintiff's FMLA interference claim.

An appropriate Order follows.

August ___2___, 2011

_William L. Standish_
William L. Standish
United States District Judge